UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>   -against-<br><br>ROBERT BROOKE,<br><br>          Defendant. | **MEMORANDUM AND ORDER**<br>Case No. 1:23-cr-0443-FB-3 |

*Appearances:*

| *For the Government:* | *For the Defendant:* |
|---|---|
| ANDREW M. RODDIN | VINCENT MARTINELLI |
| ANNA L. KARAMIGIOS | The Law Offices of Vincent J. Martinelli |
| MATTHEW R. GALEOTTI | 900 South Avenue |
| BROOKE THEODORA | Third Floor, Suite 19 |
| CLAIRE S. KEDESHIAN | Staten Island, NY 10314 |
| ELIAS LARIS | |
| Assistant United States Attorney | |
| 271 Cadman Plaza East | |
| Brooklyn, NY 1120 | |

**BLOCK, Senior District Judge:**

On December 8, 2025, a jury convicted defendant Robert Brooke of one count of Hobbs Act extortion in violation of 18 U.S.C. § 1951(a) and acquitted him of one count of conspiracy to commit Hobbs Act extortion. Brooke now moves for a judgment of acquittal pursuant to Fed. R. Crim. P. 29 or, in the alternative, for a new trial pursuant to Fed. R. Crim. P. 33. For the following reasons, Brooke's motion is **DENIED**.

## I.    Background

The indictment accused Brooke, together with co-defendant Diego Tantillo, of extorting and conspiring to extort brothers Joseph, James, and Michael Marrone between November 2019 and January 2020. Tantillo ultimately pleaded guilty to a different charge, while Brooke went to trial. Evidence at trial disclosed the following.

Joseph, James, and Michael Marrone co-own Waldorf Demolition ("Waldorf"), a demolition company headquartered in New Jersey that operates in New York, New Jersey, and Connecticut. Trial Tr. 47:16–23. In 2005, Tantillo and his brother Sal obtained an ownership interest in Waldorf and became business partners with the Marrones. *Id*. at 53:17–54:10. Waldorf routinely retains subcontractors to assist with demolition jobs. *Id*. at 54:14–18. One was Specialized Concrete Cutting Corporation ("Specialized"), a company owned by Brooke. *Id*. at 45:9–16. Tantillo, through his wife, also had an ownership interest in Specialized, which he kept hidden from the Marrones. *Id*. at 58:15–59:21.

In 2017, Waldorf subcontracted with Specialized on a demolition job at 787 11th Avenue in Manhattan (the "11th Avenue Job"). *Id*. at 304:15–305:4; 310:7–25. Brooke believed that Waldorf owed Specialized over $100,000 for equipment rentals on this job. *Id*. at 314:11–22; 315:3–24; 321:25–322:23; 326:19–335:19. Michael Marrone thought this amount was inflated and asked Tantillo to provide details. *Id*. at 319:8–24. Tantillo said he would speak to Brooke. *Id*. at 335:2–336:11. Michael Marrone did not hear anything further about this purported debt for over two years. *Id*. at 336:12–13; 347:22–348:25.

In late 2018 or early 2019, the Marrones learned that Tantillo had become a "made man" in the Gambino Crime Family. *Id*. at 61:24–25. Consequently, the Marrones decided to terminate Tantillo's involvement with Waldorf and buy out his interest in the company. *Id*. at 61:19–62:16; 64:5–65:8. They met with Tantillo and began negotiating his exit from Waldorf. *Id*. at 62:18–64:9.

Thereafter, in November 2019, Brooke confronted Joseph Marrone in a Manhattan parking lot and demanded that Waldorf pay Specialized the monies Brooke believed he was

2

owed. *Id*. at 66:2–67:14. Joseph Marrone told the defendant to discuss the issue with Michael Marrone, who handled Waldorf's finances. *Id*. at 67:15–23.

On the morning of December 18, 2019, on a street near that same parking lot, Brooke approached Joseph Marrone from behind, grabbed him, and repeatedly punched him in the face, saying, "[y]ou took my money, I don't care if I go to jail for Christmas." *Id*. at 68:2–73:16. Police were called and arrived after Brooke fled. *Id*. at 76:4–14. Joseph Marrone suffered various injuries, including a broken orbital bone and lacerations to his face, and was taken to the hospital. *Id*. at 77:20–79:22.

Following the assault, the Marrones feared for their safety and the safety of Waldorf's employees. *Id*. at 80:6–17; 91:24–92:4; 217:15–218:25; 350:19–352:17. They were also concerned that Tantillo was involved, given his suspected involvement in organized crime. *Id*. at 89:7–10; 350:19–24. In early 2020, Tantillo spoke with Michael Marrone and told him that Brooke needed to be paid. *Id*. at 345:15–354:25. Michael Marrone agreed to pay Brooke $40,000. *Id*. at 354:25. The Marrones also agreed to pay Tantillo $50,000. *Id*. at 358:25–361:6. In January 2020, Tantillo and his brother approached Joseph Marrone to ask that he not pursue any assault charges against Brooke; he agreed.[1] *Id*. at 84:23–86:24; 87:3–89:10.

## II.   Discussion

### a.  Rule 29 Motion

Pursuant to Rule 29, a court shall grant a defendant's motion for acquittal "of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "[A] defendant challenging the sufficiency of the evidence that led to his conviction at trial bears a

---

[1] The transcript is unclear as to if or when charges were filed against Brooke, but Joseph Marrone testified that he contacted the detective assigned to his case and told him, "I have decided not to pursue any . . . charges against [Brooke]." Trial Tr. 88:1–2.

heavy burden, as the standard of review is exceedingly deferential." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012).[2]

In considering a motion for judgment of acquittal, the court must view the evidence in the light most favorable to the government. *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003). The court "must credit every inference that could have been drawn in the government's favor, and affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt." *United States v. Reifler*, 446 F.3d 65, 94 (2d Cir. 2006). "[C]ourts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." *Jackson*, 335 F.3d at 180. The court "defer[s] to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir. 1998). A court will only grant a Rule 29 motion "on grounds of insufficient evidence if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *Jackson*, 335 F.3d at 180.

Brooke argues that the evidence was not sufficient to establish (1) that venue was proper in the Eastern District of New York; and (2) that he committed extortion.

(i)      Venue

Brooke contends that the government "presented nothing at trial to lay a foundation for venue" and that the only evidence was "a single tax return." Def. Mot., 6. The government responds that it adduced four years of tax records showing that Specialized was headquartered in the Eastern District; that evidence showed interstate commerce was affected in the Eastern District; and that Tantillo travelled through the Eastern District on the day of the crime.

---

[2] Throughout this opinion, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

To satisfy venue, a defendant must "be tried in the district where his crime was 'committed.'" *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) (quoting U.S. Const. art. iii, § 2, cl. 3; id. amend. VI; Fed. R. Crim. P. 18). But when the commission of an offense spans multiple districts, that offense "may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a); *United States v. Smith*, 198 F.3d 377, 384 (2d Cir. 1999). "Venue is proper only where the acts constituting the offense—the crime's 'essential conduct elements'—took place." *United States v. Ramirez*, 420 F.3d 134, 138 (2d Cir. 2005). Additionally, venue is *not* an element of a crime, requiring proof beyond a reasonable doubt; it need only be proved by a preponderance of the evidence. *United States v. Davis*, 689 F.3d 179, 185 (2d Cir. 2012).

The jury concluded that the government established venue: The Court incorrectly instructed the jury that "[i]f you find that the government has failed to prove that any act in furtherance of one of the crimes occurred in this district—*or if you have reasonable doubt on that issue*—then you must find the defendant not guilty of that crime." Trial Tr. 523:15–524:6 (emphasis added). Therefore, since the government's burden was the preponderance of the evidence, the Court's instruction inappropriately imposed the higher burden of proof standard. Nonetheless, the error was irrelevant because the jury concluded that it did not have a reasonable doubt that venue had been established.

The jury's finding had an evidentiary basis: Waldorf worked in the Eastern District and Brooke's business, Specialized, was headquartered in the district. Trial Tr. 47:18–23. Specifically, a stock redemption agreement signed and executed by Brooke in 2020 (the same year as the extorted payment), noted that his company had a "principal place of business" and "address" in Babylon, New York, which is in the Eastern District. GX 312–314, 660–662; Trial

5

Tr. 282:20–286:3. In addition, tax records from 2017 to 2020 listed the same Babylon, New York address as Specialized's business address. GX 301–310; Trial Tr. 278:14–282:15.

Nonetheless, Brooke contends that the weight of the evidence showed that Specialized was headquartered in Manhattan, which would place venue in the Southern District of New York, and that the Babylon address was just a mailing address for tax forms. Brooke is correct that other evidence at trial, such as various invoices prepared by Specialized, indicated a Manhattan address. GX 211–222; 293. However, on a Rule 29 motion, the Court "must credit every inference that could have been drawn in the government's favor[.]" *Reifler*, 446 F.3d at 94. And the jury could have reasonably inferred from the stock redemption agreement and tax records that Specialized was headquartered in Babylon. *See United States v. Rea*, 958 F.2d 1206, 1221–22 (2d Cir. 1992) ("Matters of the choice between competing inferences . . . are within the province of the jury[.]").

Thus, because Brooke's extortion targeted a company engaged in interstate commerce, including in the Eastern District, and because evidence showed Specialized was headquartered in the Eastern District, venue was satisfied.[3] *See Stephenson*, 895 F.2d at 875; *Davis*, 689 F.3d at 187. For the same reason, Brooke's argument that "no competent proof was adduced at trial that the defendant's conduct had an actual effect on interstate commerce or that any hypothetical effect was anything more than incidental" also fails. Def. Mot., 15. *See United States v. Parkes*, 497 F.3d 220, 230 (2d Cir. 2007) ("The jurisdictional requirement of the Hobbs Act may be satisfied by a showing of a very slight effect on interstate commerce. Even a potential or subtle effect on commerce will suffice.").

---

[3] Because the Court concludes that the evidence showing that Specialized was headquartered in the Eastern District and Waldorf worked in the Eastern District support a finding that interstate commerce was affected in the Eastern District, the Court need not address the government's additional argument that Tantillo's travel through the Eastern District on the day of the crime also provides a basis for venue.

      (ii)    <u>Extortion</u>

Brooke contends that no rational juror could have found the essential elements of Hobbs Act extortion beyond a reasonable doubt because the government failed to prove criminal intent or causation. The Court is not persuaded.

The Court instructed the jury that the requisite intent elements of Hobbs Act extortion are:

> (i) "that the defendant knew that the property at issue belonged to another,"
>
> (ii) "that the defendant intentionally used or threatened to use force, violence or fear of physical injury to obtain it" or "that he used or threatened fear of economic harm to obtain the property, knowing that he had no lawful claim to it," and
>
> (iii) "that the defendant used or threatened to use those means with the specific intent of inducing the other person to give up property."

Trial Tr. 515. *See* 18 U.S.C. § 1951(a); *United States v. Price*, 617 F.2d 455, 459 (7th Cir. 1979) ("In a Hobbs Act prosecution for extortion . . . the government must prove criminal intent on the part of the accused."); *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999) ("Although not stated in the Hobbs Act itself, criminal intent—acting 'knowingly or willingly'—is an implied and necessary element that the government must prove for a Hobbs Act conviction.").

As discussed above, Joseph Marrone testified that Brooke attacked him while yelling "[y]ou took my money." About a month later, the Marrones paid Brooke $40,000. The Marrones' testimony provided sufficient grounds for the jury to conclude that Brooke used violence with the specific intent of inducing the brothers to give him the money. *See* 18 U.S.C. § 1951.

Brooke argues there was an "absence of proof that [he] personally made a threat, directed a threat and/or intended fear be used as leverage." Def. Mot., 11. But the use of violence with the intent of acquiring another's property is an independent ground for an extortion conviction. *See*

18 U.S.C. § 1951(b)(2) ("The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of . . . violence[.]").

Brooke also contends that "no witness testified that [he] expressed a specific intention to coerce[.]" Def. Mot., 11. But the jury was entitled to infer his intent from circumstantial evidence, including Joseph Marrone's testimony about the attack. *See United States v. Nelson*, 277 F.3d 164, 197 (2d Cir. 2002) ("criminal intent may be proven by circumstantial evidence"). And Brooke's characterization of the "alleged pressure" as commercial rather than criminal in nature misunderstands the law. Def. Mot., 11. Even if Brooke was legitimately owed the money, the Hobbs Act criminalizes the use of violence to obtain lawful debts. *United States v. Zappola*, 677 F.2d 264, 268 (2d Cir. 1982) (the Hobbs Act "does not permit the use or threat of force or violence or fear induced thereby to collect debts"). And Brooke's reliance on *United States v. Enmons*, 410 U.S. 396 (1973) for the assertion that force may be used to collect legitimate debts is not apt. *United States v. White*, 810 F.3d 212, 224 n.4 (4th Cir. 2016) ("courts have uniformly limited *Enmons* to the labor context").

Brooke argues that the government failed to establish causation because the alleged victims were not "induced to part with property through fear, threats, or coercion on the part of Mr. Brooke." Def. Mot., 12. This fails for several reasons. First, the Court reiterates that the government was permitted to establish extortion solely through Brooke's use of violence as the means of coercion, rather than fear or threats. 18 U.S.C. § 1951(b)(2). Second, the Marrone brothers' testimony permitted the jury to infer that they feared Brooke because of the assault. Trial Tr. 91:24–92:4 (Joseph Marrone testifying that "[y]ou always get concerned when you get assaulted, it's kind of a traumatic thing"); Trial Tr. 217:24–218:25 (James Marrone testifying that, due to the defendant's attack, he was concerned for himself, his "brothers," his "children,"

and "[his] workers, as well"); Trial Tr. 351:5–352:13 (Michael Marrone testifying that, due to the defendant's attack, he "was concerned about [his] personal self" and took various steps to ensure his safety). Third, the testimony permitted the jury to infer that the Marrones paid Brooke because of his assault on Joseph Marrone and their fear of Brooke. Trial Tr. 83:10–18 (Joseph Marrone testifying that, "After the assault, we wanted to get all these things behind us, so we paid Mr. Brooke off."); *id*. at 364:25–365:8 (Michael Marrone testifying that he "would not have written [the] check at this time" if his "brother had not been attacked"). Thus, there was an evidentiary basis to support causation.

Brooke makes much of the fact that Joseph Marrone on cross-examination in response to the question "But you claim you were extorted?" replied "I didn't say I was extorted." Trial Tr. 126:17–18. First, this is literally true: he did not use the word "extorted" on direct examination. Second, read in context, the jury could have inferred that Joseph Marrone did not fully understand the question: shortly after that exchange, the Court asked him, "Do you know what extortion means?" to which he responded, "I'm confused by your question." Trial Tr. 127:3–4. Third, whether Joseph Marrone was extorted is arguably a legal conclusion and "witnesses may not present testimony in the form of legal conclusions." *Cameron v. City of N.Y.*, 598 F.3d 50, 62 (2d Cir. 2010). "Such testimony undertakes to tell the jury what result to reach, and thus attempts to substitute the witness's judgment for the jury's." *Id*.

Brooke raises a few final arguments without citation to the record or law. He argues that the government's case rested on "impermissible guilt by association"; in particular, by associating him with Tantillo and organized crime. Def. Mot., 15. It is true that the government elicited testimony from the Marrones that they believed Tantillo was involved in organized crime. Trial Tr. 61:19–63:7. The government and defense counsel litigated the admissibility of

9

this evidence extensively in pretrial motions and prior to opening statements. ECF Nos. 339, 342; Trial Tr. 13:20–15:12. The Court ultimately ruled that such testimony was admissible. *Id*. at 15:1–12.

Testimony that the Marrones believed Tantillo was involved in organized crime was properly admitted because it supported the fear element. *See United States v. Fazio*, 770 F.3d 160, 165 (2d Cir. 2014) ("The admissibility of the organized crime reputation evidence is a function of the nature of the government's required proof, which goes to the fear reasonably experienced by the victims, an element of extortion."). Based on the Marrones' testimony, the jury could have reasonably inferred that their belief that Tantillo was a member of the Gambino Crime Family contributed to their fear and decision to pay off Brooke—especially since Tantillo interceded on Brooke's behalf and the Marrones suspected that he was involved in the assault.

Furthermore, some of the organized crime discussion were invited by Brooke. Prior to opening statements, defense counsel indicated that he intended to discuss the Marrones' affiliation with "organized crime people." Trial Tr. 13:20–14:1. In response, the Court permitted the government to also address Tantillo's organized crime connections. *Id*. at 14:18–15:6. And contrary to Brooke's assertions, he did have the opportunity to cross-examine the Marrones about such connections. *Id*. at 253–58.

The rest of Brooke's "guilt by association" argument also fails. Contrary to Brooke's characterization, the government did not rely on "proximity to allegedly unsavory figures" or "suggest[] menace without evidence of action on the part of Mr. Brooke." Def. Mot., 15. Rather, evidence supported the conclusion that Brooke personally carried out the extortion.

Last, Brooke's argument that certain testimony should be discounted as not credible is meritless. "[W]hen reviewing the sufficiency of the evidence we defer to the jury's assessment of

10

witness credibility and the jury's resolution of conflicting testimony." *United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002).

      b.  Rule 33 Motion

Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009). Although the Second Circuit "generally allow[s] district courts greater deference to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, courts must nonetheless exercise Rule 33 authority sparingly and in the most extraordinary circumstances." *United States v. Coté*, 544 F.3d 88, 101 (2d Cir. 2008). The central question on a Rule 33 motion is "whether letting a guilty verdict stand would be a manifest injustice." *United States v. Walker*, 974 F.3d 193, 208 (2d Cir. 2020). A "manifest injustice" occurs where a trial court cannot be satisfied that "competent, satisfactory and sufficient evidence" supports the jury's finding of guilt beyond a reasonable doubt, and where a "real concern" exists "that an innocent person may have been convicted." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).

Brooke contends that three errors separately and cumulatively mandate a new trial: (1) the jury's inadvertent exposure to a photo; (2) improper admission of evidence concerning organized crime; and (3) improperly admitted hearsay evidence.

11

At trial, a photograph (GX 1002) showing a Waldorf employee's injuries from an attack unrelated to Brooke was inadvertently but briefly shown to the jury.[4] The record reflects that it was a harmless mistake:

On cross-examination of James Marrone, defense counsel inquired into his meetings with certain individuals affiliated with organized crime. Trial Tr. 256:5–257:18. On redirect, the government wished to inquire into the reasons for those meetings: an attack on one of Waldorf's employees. *Id*. at 259:25–261:17. The government asked for a photo of the injured victim to be shown to the witness only. *Id*. at 261:18–22. Due to a technological error, the photo was briefly published but was taken down within seconds. *See id*. at 261:23–262:1. Thereafter, the Court denied the government's request to admit the photo into evidence. *Id*. at 262:2–10.

Thus, contrary to Brooke's characterization, the photo was not "brazenly displayed by the Government in open court." Def. Mot., 17. It was accidentally published due to an issue with courtroom technology, it was immediately taken down, and the Court ruled that the photo was inadmissible.

Although the Court recognizes that violent images can be inflammatory, any possible prejudice caused by the brief publishing of this image to the jury was minimal. The photo depicted the injuries of a Waldorf employee from an October 2020 assault that no witness attributed to Brooke; it postdated the charged conduct by months; the government never suggested that it pertained to Brooke; and it was not mentioned in summation.

This case is thus distinguishable from those relied on by the defendant, including *United States v. Curley*, 639 F.3d 50, 59–60 (2d Cir. 2011), which involved extensive testimony about a

---

[4] The parties agree it was shown on the courtroom screen opposite the jury box; it is unclear, however, if the monitors inside the jury box also displayed the photograph. This distinction would not change the Court's analysis, as the Court assumes the jurors viewed the photo while it was briefly displayed in the courtroom.

prior assault linked to the defendant. Furthermore, any possible prejudice was cured by the Court's instruction to the jury as requested by the defendant. ECF No. 368. The Court delivered the following before summation on the very next day of trial:

> One thing I want to mention, I think at the end of last week, there was an effort by the Government to put in a picture of somebody who was bloodied and I didn't allow it. I don't know if you saw that, but if you did, I want you to erase it from your mind, because it's not relevant, it's not evidence, it has nothing to do with this case, and I don't want you folks to be prejudiced by the fact that you may have seen this. I remember I looked at it, but I don't know whether you inadvertently saw it before I said we're not going to allow it into evidence. Nothing to do with this case. All right. And I want to make sure that nobody is going to be prejudiced because they may have seen that briefly. So just be mindful of that.

Trial Tr. 413:9–21. As the Second Circuit has explained, "timely cautionary instructions . . . reduce[] the potential for prejudice." *United States v. Royer*, 549 F.3d 886, 901 (2d Cir. 2008). Thus, the inadvertent and brief publishing of this photo does not merit a new trial.

Next, Brooke argues that references to organized crime were unduly prejudicial. Brooke's argument here has no more merit than it did in the Rule 29 context. Brooke essentially "seeks to use Rule 33 as a vehicle to relitigate evidentiary rulings with which he disagrees." *United States v. Castro*, 669 F. Supp. 2d 288, 293 (E.D.N.Y. 2009). But such argument is more properly presented to the appellate court. *United States v. Malka*, 623 F. Supp. 3d 306, 328 (S.D.N.Y. 2022) ("Courts routinely deny attempts to relitigate already resolved matters under the guise of a Rule 33 motion.") (collecting cases); *see also United States v. Flom*, 256 F. Supp. 3d 253, 271–72 (E.D.N.Y. 2017) ("[Defendant] may not use Rule 33 as a vehicle to relitigate pretrial rulings with which he disagrees."). As the Court already explained, testimony about Tantillo's organized crime reputation was properly admitted.

Next, Brooke argues that improper hearsay was "repeatedly elicited" by the government, but he only cites one such instance: testimony from Joseph Marrone concerning a phone call. Following the assault, while Joseph Marrone was in the hospital, he testified that he received a

13

call from Sal Tantillo who told him that he "didn't deserve that" (presumably referencing the assault). Trial Tr. 80:3–4. Defense counsel moved to strike this testimony as hearsay. ECF No. 368. It was denied because it did not constitute hearsay; it was not offered for the truth of the matter asserted, i.e., that Joseph didn't deserve what happened to him. It was offered to show its effect on Joseph Marrone, as part of the Tantillos' effort to dissuade him from pressing charges. *See* Trial Tr. 80:3–4; 84:23–86:24; 87:3–89:10.

Moreover, to the extent the statement implied an assertion (i.e., that Joseph was in fact assaulted), any potential prejudice was minimal because the testimony was cumulative of properly admitted evidence, including multiple eyewitnesses' testimony about the assault. *See United States v. Gomez*, 617 F.3d 88, 95 (2d Cir. 2010).

Thus, Brooke's contention that cumulative errors warrant a new trial fails. Brooke has not identified any errors which, whether considered separately or together, "cast such a serious doubt on the fairness of the trial that the convictions must be reversed." *United States v. Guglielmini*, 384 F.2d 602, 607 (2d Cir. 1967).

### III.    Conclusion

For the foregoing reasons, Brooke's Rule 29 motion for acquittal and Rule 33 motion for a new trial are **DENIED**.

**SO ORDERED.**

/S/Frederic Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
August 6, 2026

14